**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS WESTERN DIVISION**

| | |
|---|---|
| Rebecca Dillard,<br>*Plaintiff*,<br>*v.*<br>Smoking Grill & Pizzeria, LLC,<br>*Defendant*. | Case No. 3:24-cv-50136<br>Honorable Michael F. Iasparro |

## REPORT AND RECOMMENDATION

For the reasons stated below, it is this Court's report and recommendation that Plaintiff's motions for default judgment [68] [71] be granted as modified and that judgment be entered in favor of Plaintiff and against Defendant Smoking Grill & Pizzeria, LLC in the amount of $68,579 plus post-judgment interest. Any objection to this report and recommendation must be filed by September 22, 2026. *See* Fed. R. Civ. P. 72(b). The failure to file a timely objection may result in the waiver of objections on appeal. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-61 (7th Cir. 1989). The Clerk is directed to mail a copy of this order to the last known addresses for Defendant Smoking Grill & Pizzeria, LLC's Registered Agent, Ricardo Montes De Oca at 528 East Main Street, Genoa, Illinois 60135, and 707 Doral Drive, Marengo, Illinois 60152.

## STATEMENT

### I. Background

Before the Court are Plaintiff Rebecca Dillard's motions for default judgment under Federal Rule of Civil Procedure 55(b)(2) against Defendant Smoking Grill & Pizzeria, LLC. Dkts. 68, 71. Plaintiff filed the operative Complaint[1] in this case on April 10, 2024, against Defendant for employment discrimination, harassment, and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Dkt. 1. This Court has jurisdiction over the subject matter of this case and the parties. Venue is also proper in this District.[2]

---

[1] On May 23, 2024, Plaintiff filed an Amended Complaint. Dkt. 10. However, for the reasons stated in this Court's November 19, 2025 Order, Defendant was found in default only as it relates to the claims identified in the original Complaint because there was no indication on the docket that Defendant was properly served with the Amended Complaint under Federal Rule of Civil Procedure 4. Dkt. 57. As such, Plaintiff may not proceed on any of her claims under the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, which were first asserted in her Amended Complaint.

[2] Plaintiff states in her Complaint that venue is proper in the Northern District of Illinois Eastern Division but that appears to be a scrivener's error because the events giving rise to the claims occurred at Defendant's

Plaintiff served Defendant with a summons through its registered agent on April 18, 2024. Dkt. 6. Although an attorney appeared on behalf of Defendant and answered the Complaint, that attorney was later allowed to withdraw and the answer was stricken because the attorney had no authority to represent Defendant in this action. Dkt. 57. Following counsel's withdrawal, this Court ordered Defendant to obtain counsel by November 12, 2025, or risk entry of default. Dkt. 55. Since that order, Defendant has failed to appear through counsel or respond to the Complaint. Accordingly, on November 19, 2025, an order of default was entered against Defendant. Dkts. 57–58.

On February 9, 2026, Plaintiff filed a motion for default judgment against Defendant seeking $69,798.25 in damages. Dkts. 68–69. After this Court solicited supplemental support for Plaintiff's motion, on March 11, 2026, Plaintiff filed a supplemental motion for default judgment, seeking $71,167.25 in damages. Dkts. 71–72. Plaintiff mailed a copy of both motions to Defendant's Registered Agent, Ricardo Montes De Oca, at 707 Doral Drive, Marengo, Illinois 60152. Dkts. 68, 71.[3] The Court held a telephonic hearing on Plaintiff's motions for default judgment [68] [71] on April 16, 2026, and held an in-person prove-up hearing on June 12, 2026.[4] Defendant failed to appear at both hearings. To date, Defendant has not properly appeared or responded to Plaintiff's motions.

**II. Liability**

Federal Rule of Civil Procedure 55 establishes a two-step process for obtaining a default judgment. *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, once a default has been entered, the Court may, on motion, enter a default judgment. Fed. R. Civ. P. 55(b)(2).

Following the Clerk's entry of default against Defendant, Defendant has not moved to set aside the entry of default. Accordingly, by reason of default, Defendant has admitted all the well-pleaded allegations in Plaintiff's complaint relating to liability. *See Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012). However, it remains for the Court to determine whether the unchallenged facts constitute a legitimate cause of action. *See Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2688.1 (4th ed. 2026).

---

restaurant in DeKalb, County, Illinois, which is in the Western Division. Dkt. 1 at 1; 28 U.S.C. § 93(a)(2).

[3] Defendant was originally served on April 18, 2024 at 528 East Main Street, Genoa, Illinois 60135, Dkt. 6, which is Defendant's principal address and the address listed for its registered agent as identified on the Illinois Secretary of State's website. Also, according to the Illinois Secretary of State, Defendant was involuntarily dissolved on January 10, 2025. After that date, filings mailed to Defendant at that address were returned as undeliverable, noting that the property was vacant. Dkt. 52, 56. This Court located an additional address identified on the Illinois Secretary of State's website for Registered Agent Ricardo Montes De Oca, who was also listed as a manager, as 707 Doral Drive, Marengo, Illinois 60152. *See* Fed. R. Civ. P. 5(a)(2) ("No service is required on a party who is in default for failing to appear.").

[4] Following the prove-up hearing, Plaintiff filed a supplemental request for attorneys' fees, which sought a reduced hourly rate of $500 for Attorney Travis Lampert. Dkt. 89.

As alleged in her Complaint and testified to at the prove-up hearing, Plaintiff worked for Defendant as a server/bartender from July 24, 2023, until November 9, 2023, when she was terminated. Dkt. 1 at 3–4. Plaintiff alleges that during her employment she was subjected to different terms and conditions of employment than others not within her protected class as a Caucasian[5] female and to a hostile work environment based on her race and sex. *Id.* Plaintiff testified that Defendant had 15 or more employees during her employment and the majority of the employees were Hispanic. *Hearing Recording* (6/12/2026). The two restaurant owners were also Hispanic. *Id.* Beginning in August 2023, Plaintiff testified that her Hispanic coworker, who was a cook at the restaurant, asked her out on a date. *Id.* When she said no, one of the restaurant owners began calling Plaintiff a "crazy white girl." *Id.* Plaintiff became subject to bullying from her Hispanic coworkers and the two restaurant owners. *Id.* Plaintiff was laughed at and "constantly referred to as a 'guera' or 'white girl' even after she had stated her opposition to these terms." Dkt. 1 at 3. Plaintiff was often yelled at and berated for small things because she was Caucasian, while her Hispanic coworkers were not treated in this manner. *Hearing Recording* (6/12/2026).

In September 2023, when a Hispanic coworker "became confrontational, showing willful intent to assault," Plaintiff pushed her assailant away to protect herself. Dkt. 1 at 3; *Hearing Recording* (6/12/2026). The restaurant owner grabbed Plaintiff's arm, treating Plaintiff as the aggressor, and again labeled her "crazy white girl." *Id.* Also in September 2023, Plaintiff was berated, reprimanded, and sent home early for reporting to the restaurant owners that minor employees were drinking alcohol and operating the grill. *Id.*

In October 2023, when Plaintiff was working alone with the cook, he approached Plaintiff from behind and whispered "baby" in her ear. Dkt. 1 at 3–4; *Hearing Recording* (6/12/2026). Plaintiff testified that she could feel his mustache on her ear and felt his hand on her waist. *Hearing Recording* (6/12/2026). Plaintiff immediately made her opposition clear and reported the conduct to the restaurant owner. *Id.* Plaintiff was "laughed off" and called "crazy white girl" in response to reporting the sexual harassment. Dkt. 1 at 4. The restaurant owner also told Plaintiff not to come to work for the next 3 or 4 days and to mind her own business. *Hearing Recording* (6/12/2026). The cook, however, was not reprimanded or sent home from work. *Id.* When Plaintiff returned to work, she continued to have to work with the cook, including alone, until her termination. *Id.* The cook asked her out on a date one or two more times after that incident. *Id.*

When Plaintiff returned to work, she was often scolded and yelled at for no apparent reason by the restaurant owner. *Hearing Recording* (6/12/2026). For example, at the end of October 2023, Plaintiff reported to the owner that the restaurant was short on supplies. *Id.* In response, Plaintiff was sent home early from her shift. *Id.* When Plaintiff arrived for her scheduled shift on November 9, 2023, the restaurant owner screamed at her to go home and to stop "causing drama." *Id.* The owner provided Plaintiff with no apparent reason why she was being sent home other than for reporting supply shortages to a coworker. *Id.* Based on how the owner was yelling, Plaintiff believed she had been terminated. *Id.* This was confirmed when Plaintiff later contacted the restaurant owner about returning to work and was told they had enough staff and that she should pick up her last check. *Id.* Plaintiff testified that when the restaurant owner screamed at her to go

[5] Plaintiff testified that she is half Caucasian and half Hispanic but that the restaurant owners and her coworkers did not know that she was half Hispanic.

home, it exacerbated her previously diagnosed post-traumatic stress disorder ("PTSD") and anxiety. *Id.* Then the stress from losing her job caused additional emotional distress, sleeplessness, and weight loss. *Id.*

Plaintiff now seeks default judgment on her claims for race discrimination under Title VII and 42 U.S.C. § 1981, racial and sexual harassment under Title VII, sex discrimination under Title VII, and retaliation under Title VII. Dkts. 68, 71.[6]

**A. Race and Sex Discrimination**

Plaintiff brings claims of race discrimination under Title VII and 42 U.S.C. § 1981. "The elements of proof under both Title VII and Section 1981 are 'essentially identical,' therefore we need not analyze them separately." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 n.21 (7th Cir. 2015). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff alleged and testified that during her employment, Defendant had 15 or more employees. Dkt. 1 at 2. Accordingly, this Court finds that Defendant is an employer within the meaning of Title VII and is therefore subject to Title VII liability for any violations occurring in 2023. 42 U.S.C. § 2000e(b). Additionally, Plaintiff has attached a copy of her charge of discrimination, harassment, and retaliation with the Equal Employment Opportunity Commission ("EEOC") and her EEOC right-to-sue letter. Dkts. 1–1, 1–2.

To state a prima facie claim of race or sex discrimination under Title VII, a plaintiff must show: "(1) that she is a member of a protected class; (2) that she performed her job to her employer's expectations; (3) that she suffered an adverse employment action; and (4) that one or more similarly situated individuals outside her protected class received better treatment." *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024). The Court finds that the well-pleaded factual allegations and undisputed testimony at the prove-up hearing are sufficient to satisfy the elements of a race discrimination claim. Plaintiff alleges that: (1) she is a member of a protected class as a Caucasian; (2) she "met or exceeded Defendant's performance expectations during the entire duration of her employment," testifying at the prove-up hearing that she had no performance issues and was never written up while employed by Defendant; (3) she suffered an adverse employment action when she was terminated; and (4) her Hispanic coworkers received more favorable treatment from Defendant. Therefore, the Court finds that Plaintiff is entitled to the entry of default judgment against Defendant as to her race discrimination claims in Counts I and II.

Plaintiff also brings a claim of sex discrimination under Title VII. However, the Court finds that Plaintiff has not established a sufficient basis to support her claim. Plaintiff alleges that she was unlawfully terminated because of her race or sex as a Caucasian female, but the allegations in Plaintiff's Complaint and her testimony at the prove-up hearing focused on the discrimination she suffered on account of her race compared to the race of her coworkers. Although Plaintiff

[6] Plaintiff does not request default judgment on her claim for wrongful termination under Illinois common law as outlined in Count VII of the Complaint. *See* Dkt. 1. Therefore, the Court will not address that claim here.

established that she was often being referred to as a "crazy white girl," Plaintiff's testimony at the hearing focused on being treated less favorably than her Hispanic coworkers because she was Caucasian. Plaintiff did not testify that her coworkers were treated more favorably because they were male. Therefore, the Court finds that Plaintiff is not entitled to default judgment on her sex discrimination claim in Count IV.

**B. Racial and Sexual Harassment**

To state a claim of racial or sexual harassment under Title VII, a plaintiff must show: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race or sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. *See Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024).

As to her racial harassment claim, Plaintiff's allegations and testimony establish that shortly after she started working for Defendant, she was subjected to bullying from her Hispanic coworkers and the restaurant's two owners. Plaintiff testified that beginning in August 2023, her coworkers and the restaurant owners started making comments about her race and began treating her differently. Plaintiff was laughed at and "constantly referred to as a 'guera' or 'white girl' even after she had stated her opposition to these terms." Dkt. 1 at 3. Plaintiff points to one incident in September 2023 when she was nearly assaulted by a Hispanic coworker. When Plaintiff pushed her assailant away, the restaurant owner laughed at Plaintiff, grabbed her arm, treating Plaintiff as the aggressor, and again labeled her "crazy white girl." Dkt. 1 at 3.

Plaintiff has established that she was subjected to unwelcome harassment and that the bullying and harassment were based on her race. Nevertheless, Plaintiff's allegations fall short of establishing that the harassment was severe or pervasive such that it altered the conditions of her employment. Even if Plaintiff perceived this harassment to be subjectively offensive such that it interfered with her work, which she has not specifically alleged or testified to, the court must also determine "whether a reasonable person would find [Plaintiff's] workplace hostile or abusive, looking to all of the surrounding circumstances, including whether the discriminatory conduct was frequent or severe; whether the conduct was physically threatening or humiliating; and whether the conduct unreasonably interfered with her work performance." *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 624 (7th Cir. 2004) ("We have made clear that Title VII is not a general code of workplace civility, nor does it mandate 'admirable behavior' from employers.").

Even considering Plaintiff's work environment in its totality, including the bullying and discriminatory treatment she faced both from her coworkers and the restaurant's owners throughout her employment, Plaintiff does not allege how this conduct rose to the level of a hostile work environment. Although Plaintiff alleges that the harassment was frequent, stating that she was "constantly referred to as 'guera' or 'white girl'" and often labeled "crazy white girl," Plaintiff alleges that the conduct only occurred over the course of three months. Plaintiff also does not allege that the conduct was physically threatening or humiliating other than one confrontation with a coworker where she was later labeled "crazy white girl" for defending herself. Dkt. 1 at 3. But Plaintiff did not testify or allege that she felt physically threatened during the brief encounter. Moreover, a reasonable person would not find that racial harassment interfered with Plaintiff's

work performance. Therefore, Plaintiff has not established a racial harassment claim under Title VII.

As to her sexual harassment claim, Plaintiff alleges that she worked in an environment where her coworker asked her to go on a date, that she declined his invitation, and that he nevertheless continued to ask her out two more times. Plaintiff further alleges that on one occasion, her coworker whispered "baby" in her ear while putting his hand on her waist. Plaintiff immediately made clear that this conduct was unwanted and reported the conduct to the restaurant owner, who was dismissive and retaliatory. Plaintiff was required to work with the cook, including alone, until her termination on November 9, 2023.

Plaintiff has sufficiently established that she was subjected to unwelcome sexual conduct or advances because of her sex. But again, Plaintiff has not established that this conduct was sufficiently severe or pervasive enough to alter the conditions of her employment. Plaintiff did not allege how the conduct altered how she worked or whether it caused her to avoid the coworker when they were scheduled on the same shift.

Plaintiff describes her coworker asking her on a date on three occasions, despite her refusals, and on one occasion he touched her waist while whispering "baby" in her ear. Although such conduct is undoubtedly inappropriate and unwelcome, the Seventh Circuit has held that isolated incidents of romantic advances and limited physical contact, without more, do not rise to the level of severe or pervasive harassment required by Title VII. *See, e.g., Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337–38 (7th Cir. 1993) (holding that repeated requests for dates, "I love you" signs, touching on the shoulder several times, and attempted kissing were insufficiently severe or pervasive where the incidents were relatively isolated); *see also Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (noting that "[e]ven more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation"); *Strickland v. Dart*, No. 24-3166, 2026 WL 2411204, at *3 (7th Cir. Aug. 18, 2026) (noting that "[s]tatements made by those without 'direct supervisory authority' over the plaintiff are less likely to alter the conditions of employment than those made by the plaintiff's direct supervisors") (citation omitted).

"[B]ehavior must be either severe in quality or pervasive in quantity in order to give rise to a hostile work environment." *Kaiser v. ACCO Mgmt. Co., LLC*, No. 23-CV-1539-JPS, 2026 WL 699601, at *5 (E.D. Wis. Mar. 12, 2026). Plaintiff has not established either. Even considering the totality of the circumstances of Plaintiff's employment with Defendant, Plaintiff has not established a broader pattern of sexually charged conduct that is sufficient under Title VII. *See Patton*, 455 F.3d at 816–17 (finding a hostile work environment where the plaintiff's supervisor ran his hand up the plaintiff's inner thigh, along with multiple instances of other physical contact, sexually charged comments, and alleged stalking). This Court finds that Plaintiff has not established that the sexual harassment rose to the level of creating an objectively hostile work environment.

Therefore, the Court finds that Plaintiff is not entitled to default judgment on her racial and sexual harassment claims in Counts III and V.

**C. Retaliation**

Title VII prohibits an employer from discriminating against an employee "because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Anderson*, 104 F.4th at 654 (citation omitted).

In her Complaint, Plaintiff alleges that: (1) she engaged in protected activity by reporting what she reasonably believed was unlawful sexual harassment by her coworker;[7] (2) after reporting her concerns to the restaurant's owners, Plaintiff was told she could not work for days and then she was ultimately terminated; and (3) the owners terminated Plaintiff shortly after she complained of the sexual harassment. As to her termination, Plaintiff testified that on November 9, 2023, the month following her report of sexual harassment, she arrived at work for her scheduled shift. The restaurant owner screamed at her to go home, providing Plaintiff with no apparent reason why she was being sent home other than for reporting supply shortages. When Plaintiff later contacted the restaurant owner about returning to work, the owner told Plaintiff that they had enough staff and that she should pick up her last check.

"[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and other evidence from which an inference of discriminatory intent might be drawn." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (citation modified). Here, Plaintiff was terminated the month following her report of sexual harassment. The reason Plaintiff was provided for being sent home on November 9, 2023, was for reporting supply shortages in the restaurant. Although "[r]easonable, non-suspicious explanations for the timing of the defendant's conduct can overcome the inferences of retaliation flowing from proximity in time," here, "no competing explanations exist." *Kaiser*, 2026 WL 699601, at *7 (citation modified). Defendant has not appeared or contested Plaintiff's allegations. Considering that Plaintiff had no performance issues, had recently reported harassment, and suffered discriminatory treatment following her report, terminating Plaintiff for reporting supply shortages, without more, is not a reasonable, non-suspicious explanation for her termination.

The Court finds that Plaintiff's well-pleaded factual allegations and undisputed testimony are sufficient to satisfy the elements of a retaliation claim. Therefore, Plaintiff is entitled to the entry of default judgment against Defendant as to her retaliation claim in Count VI.

## III. Damages

With liability established as to Plaintiff's claims for race discrimination and retaliation, the

[7] "It does not matter whether the alleged discriminatory conduct reported [ ] was in fact a violation of the statute, as long as [the plaintiff's] actions were based on a good-faith and reasonable belief that she was opposing unlawful conduct." *Kaiser v. ACCO Mgmt. Co., LLC*, No. 23-CV-1539-JPS, 2026 WL 699601, at *6 (E.D. Wis. Mar. 12, 2026) (citing *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)) (citation modified).

Court will now address Plaintiff's request for damages. "Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004) ("Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks."). "A court has discretion to determine the amount of damages to be awarded pursuant to the default judgment." *Smerling v. Dever*, No. 12 CV 50362, 2015 WL 75016, at *3 (N.D. Ill. Jan. 6, 2015).

Plaintiff asserts overlapping claims under Title VII and § 1981. Although the statutes provide independent causes of action and distinct remedies, Plaintiff may not obtain duplicative recoveries for the same injury under multiple legal theories. *See* 42 U.S.C. § 1981a(a)(1). The Court will determine the amount necessary to compensate Plaintiff for her actual injuries and award that amount once.

In her motions for default judgment, Plaintiff seeks damages for $9,100 in back pay, $50,000 in emotional distress, $9,009 in attorneys' fees, and $870 in costs.[8] The Court will address each below.

**A. Back Pay**

Plaintiff seeks $9,100 in back pay for 26 weeks of unemployment from November 9, 2023, the date of her termination, through May 7, 2024, when she found comparable replacement income. Dkt. 69-1. Plaintiff calculates her damages based on estimated earnings of $350 per week, working approximately 5 shifts per week.

Plaintiff is entitled to back pay under Title VII. 42 U.S.C. § 2000e-5(e)(3)(B). "Back pay is the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1258 (N.D. Ill. 2015), aff'd, 842 F.3d 1010 (7th Cir. 2016) (citation modified). As outlined in her motions for default judgment and declaration, Plaintiff requests back pay in the total amount of $9,100 based on earning $350 per week. At the prove-up hearing, Plaintiff testified that she made approximately $500 per week. The only explanation Plaintiff provided for testifying to a higher weekly estimate was that $500 per week included tips. Yet, in her declaration, Plaintiff states that she "worked for Defendant as a tipped employee and earned approximately $350 per week." Dkt. 69-1. Without any other explanation, this Court will credit Plaintiff's statement regarding her weekly income as set forth in her declaration, which appears to be based on careful consideration as opposed to an off-the-cuff response at the hearing, and as requested in both of her motions for default judgment.

Plaintiff testified at the hearing that beginning in January 2024, she did odd jobs to help support her children. However, she testified that those jobs did not pay very much and she was not able to find stable employment until May 2024. "Interim earnings 'operate to reduce the back pay otherwise allowable.'" *Gracia*, 130 F. Supp. 3d at 1259 (citing 42 U.S.C. § 2000e–5(g)(1)).

[8] Plaintiff withdrew her request for pre-judgment interest and the portion of costs in the amount of $1,054. Dkts. 88–89.

Plaintiff's uncontested testimony is that she earned very little, and there is nothing in the record to show that Plaintiff's odd jobs "rose to the level of employment (in terms of hours, compensation, and so on) such that [it] would constitute a job that generated 'earnings.'" *Id.* Therefore, this Court finds that Plaintiff is entitled to $9,100 in backpay under Title VII.

**B. Emotional Distress Damages**

Plaintiff seeks $50,000[9] in compensatory damages for the emotional distress she suffered as a result Defendant's discriminatory and retaliatory conduct. *See* 42 U.S.C. § 2000e-5(e)(3)(B) (stating that "relief authorized by section 1981a" is authorized in addition to back pay). "When assessing the propriety of a compensatory damages award, relevant inquiries may include whether the award is monstrously excessive, whether there is no rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483–84 (7th Cir. 2003) (noting that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive") (citation modified).

At the prove-up hearing, Plaintiff testified to the emotional injuries she suffered as a result of Defendant's conduct. This Court had the opportunity to observe Plaintiff's demeanor and evaluate her overall credibility. Plaintiff was tearful and sincere in recounting the events giving rise to her claims and provided detailed testimony of the incidents and resulting harm. Given Plaintiff's demeanor and the detailed nature of her testimony, this Court finds Plaintiff's testimony credible.

Plaintiff explained that she had been in an abusive relationship with her children's father and following a traumatic incident in 2013, she was diagnosed with PTSD, anxiety, and depression. Plaintiff testified that the stress that resulted from the male owner screaming at her toward the end of her employment and then losing her job when she was the only source of income for her three children, ages 14, 11, and 7, exacerbated her PTSD. Plaintiff could not afford her vehicle or her apartment, so she moved in with her mother. For three months, Plaintiff and her three children shared 1 bedroom together. This caused significant stress among herself and her children. Plaintiff was also suffering from PTSD and broke up with her boyfriend because of her mental state. As a result of the stress and worry over money and her children, Plaintiff was unable to sleep and lost 78 pounds. Beginning in January 2024, Plaintiff did odd jobs that did not pay much. Plaintiff was unable to find stable employment for six months, namely May 2024.

This Court finds that Plaintiff's testimony provides enough detail connecting Defendant's discriminatory conduct to the emotional and physical effects she suffered such that awarding $50,000 for Plaintiff's claims, while high, is not "monstrously excessive." Although Plaintiff was only employed with Defendant for a little over three months, the emotional impact was significant because she faced bullying and discrimination by both her coworkers and the restaurant's owners. Plaintiff was isolated and unsupported when she reported harassment by her coworker, and her

[9] Plaintiff has established that during her employment Defendant had 15 or more employees. Therefore, the statutory cap for compensatory damages for emotional pain and suffering under Title VII is $50,000. 42 U.S.C. § 1981a(b)(3)(A). Plaintiff acknowledges that she is seeking the statutory cap for her compensatory damages under Title VII.

complaints were dismissed and no corrective action was taken. Following her termination, Plaintiff was unable to find stable employment for six months while she was the sole income for her three children. Plaintiff suffered from significant stress resulting from the losses she faced following her termination. Plaintiff also experienced an exacerbation of her preexisting PTSD because of Defendant's discriminatory and retaliatory conduct.

This award is also in line with awards made in similar cases. In the supplement to her motions for default judgment, Plaintiff cites to several cases she contends are comparable. Dkt. 89. The strongest case Plaintiff cites in support of her damages award is *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010 (7th Cir. 2016), where the Seventh Circuit affirmed $50,000 in compensatory damages in a Title VII retaliation case where the plaintiff was the target of discriminatory treatment following reports of sexual harassment and then retaliation. Like this case, the award rested principally on the plaintiff's testimony describing her depression following her termination. *See Gracia*, 842 F.3d at 1022; *see also Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006) ("Medical support is not necessary to prove emotional injury in a Title VII case."). In affirming the award in *Gracia*, the Seventh Circuit noted the district court's reliance on another roughly comparable case, *Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058 (7th Cir. 2001). In *Tullis*, the Seventh Circuit upheld an $80,000 emotional distress award for retaliatory discharge where the plaintiff testified that he felt degraded and betrayed by the employer, was unemployed for approximately ten months, had financial difficulties, and experienced effects on his personal life. *Tullis*, 243 F.3d at 1067–68. Although Plaintiff was only unemployed for 6 months, Defendant's conduct exacerbated her psychological symptoms which affected her personal life and physical health. This Court finds that awarding Plaintiff the $50,000 she has requested is reasonable and proportionate to the emotional distress she incurred.

Based on the evidence before this Court and in the exercise of its discretion, this Court recommends an award of $50,000 in compensatory damages to Plaintiff for her emotional injury.

**C. Attorneys' Fees and Costs**

Plaintiff next seeks $9,009 in attorneys' fees, and $870 in costs. In Title VII actions, the district "court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k); *see also* 42 U.S.C. § 1988(b). "To determine a reasonable fee, the district court uses the lodestar method, multiplying the "number of hours reasonably expended on the litigation ... by a reasonable hourly rate." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011). "The fee applicant bears the burden of produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Id.* at 640 (citation modified).

The Seventh Circuit has defined a reasonable hourly rate as one that is "derived from the market rate for the services rendered." *Id.* at 640. The court may "presume that an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." *Id.* If, as here, the actual billing rate cannot be determined because the attorney sought a contingency fee, the "next best evidence" of an attorney's market rate is "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Id.* at 640. "If a fee applicant does not satisfy its burden, the district

court has the authority to make its own determination of a reasonable rate." *Id.* at 640.

Here, only one of Plaintiff's attorneys, Travis Lampert, has provided an affidavit in support of the fee request, which states that he has been practicing employment law for nearly 10 years and his hourly rate is $700. Dkt. 72-1; *see also* Dkt. 69-2. After prompting from the Court for further evidence in support of the hourly rate, Mr. Lampert reduced his requested hourly rate to $500. Dkt. 89 at 2.

Mr. Lampert does not attest to his hourly rate for comparable work or the hourly rate of Yasmeen Elagha, the other attorney identified in the time entries attached to the affidavit, who bills at $325 an hour. Mr. Lampert does not provide any fee awards he has received in similar cases. The only evidence Mr. Lampert provides in support of the market rate are two case citations in a supplemental affidavit where courts awarded $500 and $550 per hour for employment law and civil rights attorneys. Dkt. 89 at 2–3.

Mr. Lampert has not met his burden to produce satisfactory evidence in support of the market rate in this case. This Court is also concerned with Mr. Lampert's original request for $700 in this case when only a few months ago he declared that "Sulaiman Law Group's stated contract hourly rate is $575 per hour for senior attorneys, including me." *See Wright v. HZ Ops Holdings, Inc.*, Case No. 1:26-cv-04066, Dkt. 20-2 (N.D. Ill. June 26, 2026) (Americans with Disabilities Act case); *see also Wade v. Metro One Loss Prevention Services Group (Guard Division), Inc.*, Case No. 1:26-cv-02733, Dkt. 14-2 (N.D. Ill. June 3, 2026) (ADA case requesting $575 an hour); *Plonka v. Silver Star Prot. Group, LLC*, No. 25-CV-02047-JPG, 2026 WL 1674893, at *2 (S.D. Ill. June 10, 2026) (awarding Mr. Lampert his requested hourly rate of $575 in an FLSA case). Considering all this evidence, this Court finds it reasonable to award Mr. Lampert his requested $500 hourly rate. This Court also finds Attorney Elagha's $325 hourly rate and the $195 hourly rate for the paralegals at counsels' firm reasonable.

As to the number of hours expended on the litigation, Mr. Lampert calculates that he spent 2.6 hours on the matter,[10] Attorney Elagha spent 12.2 hours, and the paralegals spent a total of 19.2 hours. Given the length of this litigation, with issues relating to whether defense counsel had the authority to represent Defendant in this case, this Court finds that the total hours spent were reasonably incurred. Therefore, this Court recommends an award of reasonable attorneys' fees in the amount of $9,009.

Lastly, Plaintiff seeks an award of $870[11] in costs for the filing fee in this case and service of process. Under Federal Rule of Civil Procedure 54(d)(1), litigation costs, other than attorney's fees, are awarded to the prevailing party. Plaintiff is entitled to recover the full amount of the $405 filing fee paid in this case. *See* Dkt. 1 (receipt for filing fee of $405). Plaintiff is also entitled to recover costs of the process server. Service costs, however, may not "exceed the fee that would be

[10] The billing records attached to Mr. Lamperts affidavit identify 3.9 hours for Mr. Lampert. *Compare* Dkt. 72-1 *with* Dkt. 72-2. This Court has provided Plaintiff and her counsel enough opportunities to clarify the record as to her requested damages. Therefore, this Court will award Mr. Lampert the 2.6 hours he is requesting. *See also* Dkt. 89 at 2.

[11] Although Plaintiff states in her most recent supplement that she is requesting $780 in costs, it is unclear how she calculated that number. *See* Dkt. 89 at 2.

charged by the U.S. marshal service," which is $65.00, as set by statute. *Tower Crossing Condominium Assoc. v. Affiliated FM Insurance Co.*, No. 2025 WL 4291241, at *2 (N.D. Ill. Dec. 30, 2025); 28 C.F.R. § 0.114(a)(3). Plaintiff also seeks $375, but she provides no evidence in support of what this cost is for. Dkt. 72-3. Without any support, this Court will not award $375 in costs. Accordingly, this Court recommends that Plaintiff's total allowable costs should be $470.

**D. Post-Judgment Interest**

Lastly, Plaintiff requests post-judgment interest for her damages pursuant to 28 U.S.C. § 1961.[12] "Postjudgment interest is mandatory, calculated from the date of [judgment] 'at a rate equal to the weekly average 1-year constant maturity Treasury yield.'" *Rabiu v. Abbott Lab'ys*, No. 2026 WL 357623, at *9 (N.D. Ill. Feb. 9, 2026) (citing 28 U.S.C. § 1961(a)). It "accrues against the entirety of the [judgment], including compensatory damages and prejudgment interest." *Id.* Therefore, the Court recommends an award of post-judgment interest.

## IV. Conclusion

Based upon the evidence presented, it is this Court's report and recommendation that Plaintiff's motions for default judgment [68] [71] be granted as modified and that judgment be entered in favor of Plaintiff and against Defendant in the amount of $68,579 plus post-judgment interest from the date of entry of judgment until paid in full. This Court further recommends that Plaintiff's request for leave to conduct limited discovery in aid of execution and collection of judgment under Rule 69(a)(2) be granted. Any objection to this report and recommendation must be filed by September 22, 2026. *See* Fed. R. Civ. P. 72(b). The failure to file a timely objection may result in the waiver of objections on appeal. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-61 (7th Cir. 1989).

Entered: September 8, 2026

By: ______________________
Michael F. Iasparro
United States Magistrate Judge

[12] Plaintiff withdrew her request for pre-judgment interest. Dkts. 88–89.